IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

CADEN SPIVEY,                          *
                                       *
        Plaintiff,                     *
                                       *
        v.                             *
                                       *
TOPGOLF CALLAWAY BRANDS, CORP.         *        CV 624-004
f/k/a Callaway Golf Company,           *
et al.,                                *
                                       *
        Defendants.                    *
                                       *
                            _____

                            **O R D E R**
                            _____

Plaintiff brought this action against Defendants Topgolf
Callaway Brands, Corp. ("Topgolf"); True Sports, Inc. ("True
Sports") and True Temper Sports, Inc. (the "True Temper
Defendants"); Dick's Sporting Goods, Inc. ("Dick's"); and Vision
International Company, Ltd. ("Vision"). (Doc. 1.) Pending before
the Court are: Vision's motion to dismiss (Doc. 48) and motion for
summary judgment (Doc. 83), the True Temper Defendants' motion for
summary judgment (Doc. 77) and motion to exclude expert testimony
(Doc. 80), Callaway's motion to exclude expert testimony (Doc. 86)
and motion for summary judgment (Doc. 87), Plaintiff's motion to
exclude expert testimony (Doc. 94), and Callaway's motion to strike
portions of Plaintiff's sur-reply to its motion for summary
judgment (Doc. 110). For the following reasons, Vision's motion
to dismiss (Doc. 48) is **GRANTED** and motion for summary judgment
(Doc. 83) is **DENIED AS MOOT**; the True Temper Defendants' motion to

exclude expert testimony (Doc. 80) is **DENIED**; Callaway's motion to exclude expert testimony (Doc. 86) is **GRANTED**; Plaintiff's motion to exclude expert testimony (Doc. 94) is **DENIED**; the True Temper Defendants and Callaway's motions for summary judgment (Docs. 77, 87) are **GRANTED**; and Callaway's motion to strike (Doc. 110) is **DENIED AS MOOT**.

# I. BACKGROUND

This case arises out of injuries Plaintiff sustained when a Callaway Rogue X 20 5 Iron golf club (the "Five Iron") broke clean in half at the grip area. (Doc. 30, at 4.) According to Plaintiff, "[Callaway, the True Temper Defendants, and Vision] worked side by side throughout the manufacturing and designing process and all engaged in inspections and testing" of the Five Iron. (Doc. 102-2, at 2.) It is undisputed that True Sports manufactured the shaft of the Five Iron (id.; Doc. 89, at 2), Vision manufactured the head and assembled the Five Iron (Doc. 102-2, at 2; Doc. 102-3, at 19-20), and Callaway designed and oversaw the assembly of the Five Iron (Doc. 102-2, at 3; Doc. 102-3, at 19-20).[1]

---

[1] In True Sports' motion for summary judgment, it asserts that True Temper Sports, Inc. is not a proper party and should be dismissed. (Doc. 82, at 7.) In support, True Sports provides a sworn affidavit from its Vice President of Marketing and Innovation stating that True Temper, Inc. did not in any way engage in the design or manufacture of the Five Iron's shaft. (Doc. 77-4, at 1.) Plaintiff makes no argument in opposition. As such, the Court finds True Temper, Inc. was not involved in the making of the Five Iron and, thus, any claims against it are **DISMISSED**.

## A. The Underlying Incident and Plaintiff's Claims

Viewing the facts in the light most favorable to Plaintiff, on December 22, 2021, Plaintiff's uncle purchased a set of golf clubs, which included the Five Iron, from the Dick's store at Lenox Marketplace in Atlanta, Georgia. (Doc. 102-2, at 3-4.) The clubs were thoroughly inspected by Plaintiff's uncle at the store and then transferred in an unopened box to South Georgia. (Id. at 4.) At some point, the clubs were put in a golf bag and placed by a Christmas tree where Plaintiff received them on Christmas day in brand new condition. (Id.) Plaintiff swung each of the clubs, including the Five Iron, approximately two times on Christmas Day in his yard and then stored them in his room until sometime in January. (Id.; Doc. 102-5, at 8.) Sometime in January, Plaintiff put the clubs in the trunk of his car and took them to a driving range. (Doc. 102-5, at 10.) There, on Plaintiff's first swing of the Five Iron, its shaft broke in half at the grip area, injuring Plaintiff's hand. (Id. at 11.) According to Plaintiff, the swing was of moderate to high intensity, and he believed it to be a "clean strike," meaning the club did not strike the ground. (Id. at 12, 74.)

Plaintiff seeks recovery for compensatory damages, medical expenses, pain and suffering, loss of earning capacity, punitive damages, and attorneys' fees, all stemming from the injury to his hand. (Doc. 30, at 14.) At the time of the incident, Plaintiff had verbally committed to play college baseball at the University

3

of Notre Dame, and he went on to play there. (Doc. 102-2, at 15; Doc. 102-5, at 16-17.) Nonetheless, he alleges his injuries caused him to miss eight weeks of his senior year of high school baseball and multiple opportunities to showcase his baseball talent to professional baseball scouts. (Doc. 30, at 5.) He also alleges his injury resulted in a substantially reduced spin rate of his pitch. (Doc. 102-2, at 15.)

**B. Expert Testimony Relevant to the Pending Motions**

Relevant to the Court's analysis herein, three experts were retained to opine on the Five Iron's potential defectiveness: Joseph Crosson, Pierce D. Umberger, and Joseph Lemberg.[2]

Crosson, Plaintiff's engineering expert, testified that based on various markings on the Five Iron, he believed it had been swung multiple times prior to its fracture. (Doc. 102-6, at 73-74.) He concluded that, based on the markings and manner of the fracture, the Five Iron broke during a normal golf swing rather than during misuse or abuse. (Id. at 90.) Additionally, he stated that he would not expect a golf club to fracture during a normal swing. (Id. at 90-92.) Crosson testified that a non-defective club could fracture with application of a load beyond its breaking strength, and he believed the Five iron's fracture was a "single event

---

[2] Plaintiff also moved to exclude testimony of expert Dr. Merrick Wetzler, who opined on how Plaintiff's injuries did or did not impact his pitching ability. (Doc. 94-1, at 6-8.) Because the Court does not reach the issue of damages, Plaintiff's motion to exclude Dr. Wetzler's testimony (Doc. 94-1) is **DENIED AS MOOT**.

overstress fracture." (Id. at 40-41.) He did not, however, calculate the load force the Five Iron could have accommodated without fracturing, nor was he aware of the typical force applied during a golf swing or the load applied here. (Id. at 83-85.) Crosson further testified that, based on his testing, he found nothing wrong with the Five Iron's material properties nor did he find any metallurgical defects associated with the fracture. (Id. at 43.) To the contrary, he found that the shaft met True Sports' specifications, including the hardness of the shaft, which is directly correlated to its strength. (Id. at 43, 50, 83.) Crosson rendered no opinion as to the Five Iron's design. (Id. at 85.)

True Sports identified Umberger, an expert in the field of applied mechanics, who similarly concluded there was no evidence indicating a material manufacturing or design defect with the Five Iron's shaft. (Doc. 77-3, at 8.) Umberger also agreed with Crosson that the Five Iron fractured due to a single stress event. (Id.) Specifically, Umberger testified that the fracture was consistent with the Five Iron being subject to loads outside of its intended use which, in his opinion, was consistent with misuse or abuse. (Id.) Unlike Crosson, Umberger supported this opinion by testing exemplar clubs to determine the load they were capable of bearing and found that the stress required for an exemplar Callaway club to fail was four to five times higher than the stress he was able to apply with a normal golf swing. (Id. at 11-12.) Umberger also tested the load bearing capacity of various other

clubs and found the exemplar Callaway club was within the normal range of stress bearing capacity. (Id. at 9.) Based on these findings, Umberger concluded misuse or abuse to be the likely cause of the Five Iron's failure. (Id. at 24.)

Callaway identified Lemberg as an expert engineer, and Lemberg also found no evidence of a design or manufacturing defect having caused or contributed to the fracture of the Five Iron. (Doc. 94-3, at 59-60.) Lemberg's conclusions, based on various scientific inspections, are summarized as follows:

1) The subject shaft fractured in overload at a location where the shaft was deformed and no longer circular.
2) It is unknown when this deformation occurred prior to the fracture, but based on scuff marks, material transfer on the subject club head and, other features observed on multiple clubs, I cannot rule out misuse, mishandling, or abuse of the subject club as a cause of the shaft fracture.
3) My examination of available shaft remnants did not reveal any evidence of shaft design or manufacturing defects that could be partially or wholly responsible for the fracture of the shaft.

(Doc. 94-2, at 27.) Lemberg further concluded the Five Iron had been swung multiple times prior to the fracture occurring, evidenced by several features of its condition including misalignment of the shaft where the head attached, a dent at the fracture site, dirt in the grooves, scuff marks on the sole, and an unknown red material on both the face and sole. (Doc. 94-3, at 37-39.) He concluded the Five Iron's condition was consistent with misuse or abuse and that, given the inspection procedures in place at manufacturing, the shaft's deformity likely did not occur

during the manufacturing process.  (Id. at 54, 66, 72-75, 79-80; Doc. 95-9 at 3.)

## C. Procedural History

Plaintiff filed this case on January 3, 2024 in the State Court of Tattnall County, Georgia, and Topgolf removed to this Court on February 2, 2024.  (Doc. 1-1, at 5; Doc. 1.)  On April 25, 2024, Plaintiff filed an amended complaint asserting negligence claims against Callaway, True Sports, and Vision under theories of manufacturing defect, design defect, and failure to warn.  (Doc. 30, at 5-9, 11-12.)  Plaintiff also asserts strict liability claims against Callaway and True Sports under manufacturing and design defect theories, as well as a breach of warranty claim against Dick's.  (Id. at 7-12.)  On September 3, 2024, Vision filed a motion to dismiss all claims against it (Doc. 48), to which Plaintiff responded in opposition (Doc. 51) and Vision replied in support (Doc. 53).  On January 15, 2025, the Court granted Plaintiff's voluntarily dismissal of all claims against Dick's, and discovery in this matter as to the remaining claims closed.  (See Docs. 54, 74, 76.)

Following the close of discovery, True Sports, Vision, and Callaway each filed motions for summary judgment.  (Docs. 77, 83, 87.)  Plaintiff responded to True Sports and Callaway's motions in one briefing (Doc. 102), Callaway replied (Doc. 104), and Plaintiff filed a sur-reply (Doc. 109).  On April 28, 2025, Callaway moved to strike various sections of Plaintiff's sur-reply (Doc. 110),

and Plaintiff responded to the motion to strike (Doc. 111). Plaintiff filed a separate response to Vision's motion for summary judgment. (Doc. 101.)

True Sports and Callaway also filed <u>Daubert</u> motions seeking to exclude various parts of Crosson's expert testimony. (Docs. 81, 86.) Plaintiff again filed one response addressing both motions. (Doc. 96.) Plaintiff also filed a motion in limine to exclude parts of Lemberg's expert testimony (Doc. 94), and Callaway responded (Doc. 95). All pending motions are now ripe for the Court's review.

## II. VISION'S MOTION TO DISMISS

Before the Court is Vision's motion to dismiss for lack of personal jurisdiction. (Doc. 48.)

### A. Legal Standard

"In the context of a motion to dismiss for lack of personal jurisdiction in which no evidentiary hearing is held, the plaintiff bears the burden of establishing a prima facie case of jurisdiction over the movant, non-resident defendant." <u>Morris v. SSE, Inc.</u>, 843 F.2d 489, 492 (11th Cir. 1988) (citations omitted). The facts presented in the plaintiff's complaint are taken as true to the extent they are uncontroverted. <u>Cable/Home Commc'n Corp. v. Network Prods., Inc.</u>, 902 F.2d 829, 855 (11th Cir. 1990) (citations omitted). If, however, the defendant submits affidavits challenging the allegations in the complaint, the burden shifts

back to the plaintiff to produce evidence supporting jurisdiction. Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc., 593 F.3d 1249, 1257 (11th Cir. 2010) (citations omitted). "Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." Id. (citation omitted).

To determine whether a nonresident defendant is subject to personal jurisdiction in Georgia, the Court must perform a two-part analysis. Id. at 1257-58. First, the Court must decide whether the exercise of personal jurisdiction is proper under Georgia's long-arm statute, O.C.G.A. § 9-10-91. Id. Next, the Court must determine whether there are sufficient "minimum contacts" with the forum state to satisfy the Due Process Clause of the Fourteenth Amendment. Id.; Int'l Shoe Co. v. Washington Office of Unemployment Comp. & Placement, 326 U.S. 310, 316 (1945).

The Eleventh Circuit has held that "the Georgia long-arm statute does not grant courts in Georgia personal jurisdiction that is coextensive with procedural due process," but instead "imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process." Diamond Crystal, 593 F.3d at 1259. "[C]ourts must apply the specific limitations and requirements of O.C.G.A. § 9-10-91 literally and must engage in a statutory examination that is independent of, and distinct from,

the constitutional analysis to ensure that both, separate prongs of the jurisdictional inquiry are satisfied." Id. at 1263.

## B. Discussion

Vision argues all claims against it should be dismissed because it is not subject to jurisdiction under the Georgia long-arm statute or the federal Due Process Clause, providing an affidavit in support of such (Doc. 48-1).  (Doc. 48, at 6-12.) Plaintiff argues Vision is subject to personal jurisdiction in Georgia under the first prong of Georgia's long-arm statute, relying on Coe & Payne Co. v. Wood-Mosaic Corp., 195 S.E.2d 399 (Ga. 1973), a case which has since been abrogated by Innovative Clinical & Consulting Servs., LLC v. First Nat. Bank of Ames, 620 S.E.2d 352 (Ga. 2005).  (Doc. 51, at 3-7.)  Plaintiff also argues exercising personal jurisdiction over Vision does not offend due process because Vision maintained a relationship with Callaway, a national business.  (Id. at 7.)

As noted above, to determine whether it can exercise personal jurisdiction over Vision, the Court must independently examine whether the exercise of such jurisdiction is proper under Georgia's long-arm statute.  The Georgia long-arm statute provides:

> A court of this state may exercise personal jurisdiction over any nonresident or his or her executor or administrator, as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he or she were a resident of this state, if in person or through an agent, he or she:
>
> (1)  Transacts any business within this state;

> (2)   Commits a tortious act or omission within this
>       state . . . ;
> (3)   Commits a tortious injury in this state caused by
>       an act or omission outside this state if the tort-
>       feasor regularly does or solicits business, or
>       engages in any other persistent course of conduct,
>       or derives substantial revenue from goods used or
>       consumed or services rendered in this state . . . .

O.C.G.A. § 9-10-91(1)-(3).

To meet the "transacts any business" prong, a nonresident defendant must purposefully do some act or consummate a transaction in Georgia. Diamond Crystal, 593 F.3d at 1264 (citing Aero Toy Store, LLC v. Grieves, 631 S.E.2d 734, 736-37 (Ga. Ct. App. 2006)). Nothing in subsection one of the long-arm statute "requires the physical presence of the nonresident in Georgia or minimizes the import of a nonresident's intangible contacts with the State." Innovative Clinical & Consulting Servs., 620 S.E.2d at 355; see Power Guardian, LLC v. Directional Energy Corp., 904 F. Supp. 2d 1313, 1320-21 (M.D. Ga. 2012) (finding intentional sale of products to, electronic and personal contact with, and acceptance of payment from a Georgia company sufficient to constitute "any business," even when defendant never entered the state).

Based on the record, under a literal interpretation of the long-arm statute, Vision has not transacted business in Georgia. Vision, through an affidavit, shows it is a Vietnamese company that has no employees in Georgia, owns no property in Georgia, has no bank accounts in Georgia, is not registered to do business in Georgia, and has never sold golf equipment to a Georgia citizen.

(Doc. 48-1, at 2-3.)  Because Vision's affidavit rebuts Plaintiff's allegations as to personal jurisdiction, the burden shifts back to Plaintiff to produce evidence supporting jurisdiction.  <u>Diamond Crystal</u>, 593 F.3d at 1257.

Plaintiff argues Vision transacted business in Georgia because it took orders from and shipped golf clubs to Callaway, who then distributed and sold those clubs nationally.  (Doc. 51, at 4.)  But Callaway is a Delaware corporation with its principal place of business in California.  (Doc. 48-1, at 3.)  And while Callaway does business in all fifty states, Vision's transactions with Callaway take place solely in Asia, and Vision has no knowledge of or control over where the golf clubs it sends Callaway will be sold.  (<u>Id.</u>)  This "stream of commerce" jurisdiction theory - that simply selling to a national distributor is sufficient to constitute transacting business in Georgia - has been repeatedly rejected.  <u>See</u> <u>Montoya v. Samsung SDI Co.</u>, No. 4:22-CV-6, 2022 WL 18776009, at *6 (S.D. Ga. Dec. 28, 2022) (citing multiple cases rejecting this theory).  Therefore, Vision's transactions with Callaway are insufficient to satisfy the requirements of O.C.G.A. § 9-10-91(1).

Moreover, while Plaintiff does not expressly assert personal jurisdiction exists under O.C.G.A. § 9-10-91(3), he seems to rely on <u>Coe</u> to argue Vision is subject to personal jurisdiction under subsection (3) of Georgia's long-arm statute because the damage caused by Vision's negligence occurred in Georgia.  (Doc. 51, at

4.)   However, as noted above, <u>Coe</u> has since been abrogated by <u>Innovative Clinical</u>, which clarified that for a defendant to be liable for a tortious act committed outside of Georgia, it must "regularly conduct or solicit business in Georgia, engage in any other persistent course of conduct in Georgia or otherwise derive substantial revenue from goods used or consumed or services rendered in Georgia."  620 S.E.2d at 355-56.  As discussed above, Plaintiff has not shown Vision conducted *any* business in Georgia, let alone "regular," "persistent," or "substantial" business.  <u>See id.</u> at 356 n.4.  For these reasons, Plaintiff has failed to show Vision is subject to personal jurisdiction under Georgia's long-arm statute, and Vision's motion to dismiss (Doc. 48) is **GRANTED.** <u>See</u> <u>Diamond Crystal</u>, 593 F.3d at 1259 (emphasizing that Georgia's long-arm statue imposes jurisdictional obligations independent of Due Process).  Because the Court lacks personal jurisdiction over Vision, Vision shall be **TERMINATED** as a party, and Vision's pending motion for summary judgment (Doc. 83) is **DENIED AS MOOT.**

### III. MOTIONS TO EXCLUDE EXPERT TESTIMONY

Because the expert testimony the Parties seek to exclude is relevant to the pending motions for summary judgment, the Court

next addresses True Sports and Callaway's Daubert motions (Docs. 80, 86) and Plaintiff's motion in limine (Doc. 94).

## A. Legal Standard

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert opinion reflects a reliable application of the principles and methods to the facts of the case.

"Rule 702 plainly contemplates that the district court will serve as a gatekeeper to the admission of [expert] testimony." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340 (11th Cir. 2003) (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993)). "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999) (citing Daubert, 509 U.S. at 592 n.10).

In the Eleventh Circuit, district courts are to engage in a three-part inquiry to determine the admissibility of expert

testimony under Rule 702. Quiet Tech., 326 F.3d at 1340. Specifically, courts must consider whether:

> (1) The expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Id. at 1340-41 (citations omitted).

Regarding the first prong, an expert may be qualified to testify due to his knowledge, skill, experience, training, or education. Trilink Saw Chain, LLC v. Blount, Inc., 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008) (citation omitted). "A witness's qualifications must correspond to the subject matter of his proffered testimony." Anderson v. Columbia Cnty., No. CV 112-031, 2014 WL 8103792, at *7 (S.D. Ga. Mar. 31, 2014) (citing Jones v. Lincoln Elec. Co., 188 F.3d 709, 723 (7th Cir. 1999)). However, an expert's training need not be narrowly tailored to match the exact point of dispute. McDowell v. Brown, 392 F.3d 1283, 1297 (11th Cir. 2004).

Second, the testifying expert's opinions must be reliable. When considering the reliability prong, district courts are to conduct a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93. Courts

should consider: (1) whether the theory or technique can be tested, (2) whether it has been subject to peer review, (3) whether the technique has a known or potential rate of error, and (4) whether the theory has attained general acceptance in the relevant community. Id. at 593-94. "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) (citations omitted). For example, experience-based experts need not satisfy the factors set forth in Daubert. See United States v. Valdes, 681 F. App'x 874, 881 (11th Cir. 2017) (finding Daubert reliability factors "inapplicable" when affirming qualification of firearm identification expert based upon years of experience working with firearms). However, "[t]he inquiry is no less exacting where the expert 'witness is relying solely on experience' rather than scientific methodology." Summit at Paces, LLC v. RBC Bank, No. 1:09-cv-03504, 2012 WL 13076793, at *2 (N.D. Ga. May 22, 2012) (quoting FED. R. EVID. 702 advisory committee's notes to 2000 amendment). Bearing in mind the diversity of expert testimony, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). "[W]hether the proposed testimony is scientifically correct is not a consideration for this court, but

only whether or not the expert's testimony, based on scientific principles and methodology, is reliable." In re Chantix Prods. Liab. Litig., 889 F. Supp. 2d 1272, 1280 (N.D. Ala. 2012) (citing Allison, 184 F.3d at 1312). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (citations omitted and alterations adopted).

Regardless of the specific factors considered, "[p]roposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590. In most cases, "[t]he expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." FED. R. EVID. 702, advisory committee's note to 2000 amendment. "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" to carry the proponent's burden. Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1113 (11th Cir. 2005). Thus, "if the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Frazier, 387 F.3d at 1261 (citation omitted).

Third, expert testimony must assist the trier of fact to decide a fact at issue. The Supreme Court has described this test as one of "fit." Daubert, 509 U.S. at 591 (citation omitted). To satisfy this requirement, the testimony must concern matters beyond the understanding of the average lay person and logically advance a material aspect of the proponent's case. Id.; Frazier, 387 F.3d at 1262. Yet, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63.

## B. True Sports and Callaway's Motions to Exclude Crosson's Testimony

True Sports moves to exclude Crosson's testimony that the fracture occurred during a normal golf swing and was not the result of misuse or abuse, arguing his opinion is unreliable and irrelevant. (Doc. 81, at 4-5.) Callaway moves to exclude Crosson's opinion that he would not expect a golf club to fracture during a normal golf swing because Crosson is not qualified to render opinions about a club's expected performance, and his opinion is a backdoor attempt to bring in a "*res ipsa*" opinion that is both unreliable and irrelevant. (Doc. 86, at 4, 7-10.) Plaintiff opposes both motions, arguing Crosson is qualified to

speak on both matters and his analysis was based on reliable processes and methodologies.  (Doc. 96, at 4-6.)

1. Crosson's Opinion that the Fracture Occurred During a Normal Golf Swing

True Sports contends Crosson's testimony stating the fracture occurred during a normal golf swing and was not the result of misuse or abuse is both unreliable and irrelevant because it is a speculative conclusion not based on any scientific analysis and therefore does not assist the trier of fact.  (Doc. 81, at 4.)  In response, Plaintiff argues Crosson's processes and methodologies are sufficiently reliable, noting his significant experience in failure analysis and the fact that his opinion was based on an extensive examination of the abrasions and strike marks on the Five Iron, as well as the load direction of the fracture.  (Doc. 96, at 6.)

The Court finds Crosson's testimony that the fracture occurred during a normal golf swing is sufficiently reliable. Crosson holds both a Bachelor of Science and Master of Science in metallurgical engineering and has been conducting root cause failure analysis investigations for several decades.  (Doc. 96-1, at 1.)  He represents that in examining the Five Iron, he relied on his experience and visual and photographic examinations of the Five Iron, a metallographic analysis, Vickers microhardness testing, and a compositional analysis.  (Doc. 96-4, at 149-51.) In assessing the causal nature of the Five Iron's condition,

Crosson relied on its physical appearance, personal experience, and the angles of the abrasions and transferred materials. (Id. at 60-62.) Specifically, Crosson testified that the perpendicular angles of the markings on the Five Iron suggested they were incurred during a normal swing, and the nature of the deformity in the shaft was consistent with a single event overstress fracture. (Id. at 62, 65-66.) Because Crosson relied on his experience in root cause analysis, the angular nature of the abrasions, and other deformities on the Five Iron to form his opinion that the club fractured during a normal swing, the Court finds his opinion is sufficiently reliable and assists the trier of fact. Accordingly, True Sports' motion to exclude Crosson's testimony and report (Doc. 80) is **DENIED.**

2. Crosson's Opinion that He Would Not Expect a Golf Club to Fracture During a Normal Golf Swing

Callaway argues Crosson's opinion that he would not expect a properly designed and manufactured golf club to fracture during a normal golf swing should be excluded because it fails under all three prongs of the Daubert analysis. (Doc. 86, at 7-10.) As to the first prong, Callaway argues Crosson is not qualified to render opinions as to the expected performance of golf clubs because he is an engineer, not a professional golfer or expert in club design and performance. (Id. at 7-8.) Plaintiff argues Crosson's experience as a metallurgical engineer qualifies him to render opinions as to a golf club's expected performance. (Doc. 96, at

5.)  The Court agrees with Plaintiff.  While Crosson admittedly is not an expert in golf club design or manufacturing, his area of expertise includes evaluating and conducting root cause failure analyses of metallic components.  (Doc. 96-4, at 16-17, 133.) Crosson's expertise need not be narrowly tailored to golf clubs. See McDowell, 392 F.3d at 1297.  As such, his expertise in metal component failures makes him sufficiently qualified to offer an expert opinion as to the expected performance and durability of a metal shaft on a golf club.

Callaway also argues that, even if Crosson is qualified, his res ipsa-flavored opinion should be excluded because he points to no data, tests, or measurements in reaching the conclusion that a non-defective club would not fracture during a normal swing, and, as such, this opinion is unreliable.  (Doc. 86, at 9.)  Plaintiff again relies on Crosson's extensive visual examination of the abrasions and strike marks to argue this opinion is sufficiently reliable.  (Doc. 96, at 6.)  However, Plaintiff fails to explain how a visual examination of this specific Five Iron informs his expectations about golf club performance generally.  (See id.) Moreover, Crosson admitted he could not render an opinion as to the Five Iron's design or golf club design generally, nor did he calculate the Five Iron's load bearing capacity or know the industry standard load bearing capacity.  (Doc. 96-4, at 83-86.) Indeed, when rendering this opinion, he pointed to no factual or analytical bases for it.  (See id. at 92.)  His opinion that he

would not expect a non-defective golf club to fracture during a normal swing is therefore not sufficiently reliable.

Callaway further argues this opinion should be excluded because it requires "a large analytical leap" and therefore does not satisfy Daubert's "fit" test. (Doc. 86, at 9.) Plaintiff does not address this argument in his response (Doc. 96), and the Court agrees with Callaway. This conclusion, seemingly based solely on Crosson's experience as a recreational golfer, does not assist the trier of fact or offer anything other than the type of speculation that is more appropriate for Plaintiff's closing argument. See Frazier, 387 F.3d at 1262-63. As such, Callaway's motion to exclude Crosson's opinion that a properly designed and manufactured golf club should not break during the normal course of use is **GRANTED**. (Doc. 86.)

## C. Plaintiff's Motion to Exclude Lemberg's Testimony

Plaintiff moves to exclude several opinions of Callaway's expert, Lemberg. (Doc. 94-1, at 4-6.) Though Plaintiff indicates he takes issue with all of Lemberg's opinions, he represents that he only "specifically" takes issue with and offers argument as to two. (Id.)

The first opinion Plaintiff takes issue with is Lemberg's opinion that

> [i]t is unknown when [the shaft's] deformation occurred prior to the fracture, but based on scuff marks, material transfer on the subject club head and, other features observed on multiple clubs, I cannot rule out misuse,

mishandling, or abuse of the subject club as a cause of the shaft fracture.

(Id. at 5.) Plaintiff argues this opinion does not assist the trier of fact because it is not a conclusion at all, but rather re-raises the issue of what caused the Five Iron to fracture. (Id.) Callaway argues this opinion is admissible because Lemberg used reliable methodologies in reaching it and it assists the trier in fact in deciphering how testing data on the Five Iron's condition is consistent with misuse or abuse. (Doc. 95, at 12-13.)

The Court agrees with Callaway. Lemberg relies on largely the same scientific methodologies as Plaintiff's expert, Crosson, which the Court found herein to be sufficiently reliable. (See Doc. 95-7.) And Lemberg's opinion, based on scientific examinations and analyses, assists the trier of fact by explaining how various features of the Five Iron - such as the unknown red material, dirt, scuff marks, misalignments, and the shaft's deformity - are consistent with misuse or abuse. (Doc. 94-3, at 49-50, 57.) To the extent Plaintiff takes issue with the fact that Lemberg's assessment differs from his own expert, the difference in opinion can be addressed on cross examination.

Lemberg's second opinion with which Plaintiff takes issue states: "My examination of available shaft remnants did not reveal any evidence of shaft design or manufacturing defects that could be partially or wholly responsible for the fracture of the shaft."

(Doc. 94-1, at 5.)  Plaintiff argues this opinion is unreliable because it contradicts Lemberg's statement in his deposition that the Five Iron's misalignment and deformity could have been introduced during the manufacturing and design processes.  (Id. at 5-6.)  While directly contradicting opinions could raise concern, the Court agrees with Callaway that Plaintiff's reiteration of Lemberg's opinions is not wholly accurate.  (Doc. 95, at 12-13.)  In his deposition, Lemberg consistently stated that his inspection of the Five Iron showed it met True Sports' specifications and he found nothing wrong with its material properties, nor did he find any metallurgical defects.  (Doc. 94-3, at 65, 78, 81.)  With regards to the deformity on the Five Iron's shaft, Lemberg testified that based on a review of True Sports' specifications, it was not a design defect.  (Doc. 95-4, at 23-24.)  He did testify that the deformity, hypothetically, could have been introduced in manufacturing, but that he would expect manufacturing inspection processes to have flagged any deformity as it would have been plainly visible.  (Id. at 25-26.)  He later was able to review the inspection processes in place and confirmed that if the deformity was introduced during manufacturing, it would have been caught during inspection, rendering him able to narrow the window of time in which it could have been introduced.  (Doc. 95-9, at 3.)  Lemberg, in essence, states that while he cannot pinpoint exactly when the deformity occurred, he can affirmatively conclude it was likely sometime after manufacturing.  (Id.)  Because the Court

finds no contradiction in these opinions, it finds Lemberg's opinion that his examination did not reveal any evidence of shaft design or manufacturing defects that could be partially or wholly responsible for the fracture of the shaft sufficiently reliable. As such, Plaintiff's motion in limine to exclude Lemberg's opinions (Doc. 94) is **DENIED**.


## IV. TRUE SPORTS AND CALLAWAY'S MOTIONS FOR SUMMARY JUDGMENT

The Court now turns to True Sports and Callaway's motions for summary judgment (Docs. 77, 87.)

## A. Legal Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could "affect the outcome of the suit under the governing [substantive] law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and a dispute is genuine "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor," Waddell v. Valley Forge Dental Assocs., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001) (citation omitted). The court must view factual disputes in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [the nonmoving party's] favor," United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th

Cir. 1991) (en banc) (internal punctuation and citations omitted). The court should not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Because the standard for summary judgment mirrors that of a directed verdict, the initial burden of proof required by either party depends on who carries the burden of proof at trial. Id.

When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case, or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608. If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears

the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. <u>Fitzpatrick</u>, 2 F.3d at 1116. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." <u>Id.</u> If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." <u>Id.</u> at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. <u>See</u> <u>Morris v. Ross</u>, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of the Court gave Plaintiff notice of Defendants' motions for summary judgment and informed him of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Docs. 84, 92.) The notice requirements of <u>Griffith v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), therefore, are satisfied, and these motions are ripe for review.

**B. Discussion**

Because True Sports and Callaway make similar arguments in their respective motions for summary judgment (Docs. 77, 88) and Plaintiff addresses both motions together in his response (Doc. 102), the Court considers the two motions together.[3]

  1. Presence of a Defect

Plaintiff asserts product liability claims sounding in both negligence and strict liability against Callaway and True Sports, asserting each claim under theories of design defect, manufacturing defect, and failure to warn. (Doc. 30, at 6-10.)

Both True Sports and Callaway argue Plaintiff's product liability claims fail because Plaintiff has failed to present any admissible evidence to support finding the existence of a defect. (Doc. 82, at 7-9; Doc. 88, at 7-8.) Plaintiff argues the fact that the Five Iron broke in half when Plaintiff struck a golf ball with it is direct evidence that the club was, in fact, defective. (Doc. 102, at 3.) Plaintiff further asserts that the testimonies of Crosson and Umberger, taken together, show Plaintiff did not misuse the club and that, assuming there was no misuse or abuse, Plaintiff could not possibly have applied the necessary force to cause such failure absent a defect. (Doc. 109, at 3.)

---

[3] Unique to Callaway's motion is its argument that Callaway did not design or manufacture the Five Iron's shaft. (Doc. 88, at 8-9.) Because the Court finds Callaway entitled to summary judgment on alternative grounds, the Court does not address the merits of this argument.

Under Georgia law, a plaintiff may prevail on a products liability claim by showing the product "was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained." O.C.G.A. § 51-1-11(1)(b). "The existence of some defect is an 'essential element' of a product liability claim, 'whether brought under a theory of strict liability or of negligence.'" Jester v. Emerson Climate Techs., Inc., No. 1:19-CV-05735-WMR, 2022 WL 1044060, at *5 (N.D. Ga. Jan. 5, 2022) (quoting Udoinyion v. Michelin N. Am., Inc., 721 S.E.2d 190, 193 (Ga. Ct. App. 2011)). A plaintiff may allege three types of product defects: design defect, manufacturing defect, and marketing/packaging defect. Id. Here, Plaintiff alleges both a design and manufacturing defect. (Doc. 30, at 6-10.) The Court addresses whether there is sufficient evidence of each in turn.

### a. *Manufacturing Defect*

Callaway and True Sports argue there is no admissible evidence of a manufacturing defect because failure of a product, without more, is insufficient, and all experts, including Plaintiff's, concluded there was nothing wrong with the Five Iron's material properties, it had no metallurgical defects, and it met all of True Sport's specifications. (Doc. 82, at 7-10; Doc. 88, at 7-8.) Plaintiff argues the fact the club broke is sufficient evidence to support finding the presence of a manufacturing defect. (Doc. 102, at 3.)

The presence of a manufacturing defect may be inferred through circumstantial evidence – such as the failure of the product itself – in certain circumstances, but this is typically only appropriate when the product is completely destroyed such that it is impossible to determine whether there was a manufacturing defect. Crews v. Tahsin Indus. Corp. USA, No. 20-14078, 2022 WL 1567707, at *2 (11th Cir. May 18, 2022). On the other hand, where "[the] parties had ample opportunity to examine and test [the product]" and "the existence of a manufacturing defect is not the only plausible explanation" for the product's failure, the product's failure itself is insufficient to establish a manufacturing defect. Id.; see also In re Mentor Corp. Tape Transobturator Sling Prods. Liab. Litig., 711 F. Supp. 2d 1348, 1377 n.12 (M.D. Ga. 2010) ("Where the existence of a manufacturing defect is not the only plausible explanation for a product's failure, the product's failure, standing alone, is not sufficient to establish a manufacturing defect." (citations omitted)); Miller v. Ford Motor Co., 653 S.E.2d 82, 84 (Ga. Ct. App. 2007) ("[T]he mere failure of [the product] is not itself evidence of an original defect, since the failure can be the result of myriad causes not related to its manufacture." (internal quotation marks and citation omitted)). Because both Parties had the opportunity to examine and test the properties of the Five Iron and there are multiple plausible explanations for the Five Iron's failure, including misuse or abuse, damage during prior use, or mishandling, the Court finds the mere fact that the

Five Iron broke insufficient to prove the existence of a manufacturing defect.

Plaintiff also points to Crosson's statement that there is no evidence of abuse or misuse on the Five Iron and Umberger's destructive testing of an exemplar club as direct evidence that a defect was present. (Doc. 109, at 2-3.) Plaintiff raises this argument for the first time in his sur reply, making it improper. See Roberts v. Philadelphia Express Tr., No. 4:20-CV-236, 2022 WL 22885491, at *10 (S.D. Ga. June 23, 2022).

Regardless, the Court finds the statements unavailing. Crosson's statement is, at best, circumstantial evidence suggesting that the fact the Five Iron fractured during normal use is evidence of a defect. Moreover, a lack of evidence affirmatively showing abuse or misuse does not equate to evidence that a manufacturing defect existed, particularly considering Crosson's own testimony that there were no signs of such defects on the Five Iron. (See Doc. 102-6, at 43.) As to Umberger's testing performed on an exemplar club, this similarly is not direct evidence that a defect existed. Rather, as with Crosson's statement, it invites speculation that because the club fractured, there must have been a defect - an inference that directly contradicts Umberger's conclusion that he found no evidence of such. For the reasons already stated, such inferences alone are not enough to survive a motion for summary judgment.

Plaintiff also asserts that the misalignment of the Five Iron and the deformity in the Five Iron's shaft constitute direct evidence of a defect. (Doc. 102, at 12.) In support of this, Plaintiff relies on Umberger's alleged testimony that "the fracture was caused by a dent in the shaft coupled with misalignment." (Id.) However, Plaintiff fails to cite anywhere in Umberger's testimony where this assertion is made. (See id.) And upon the Court's review of Umberger's testimony, it finds Plaintiff's portrayal of Umberger's statements to be a gross misrepresentation. (See Doc. 102-7.) Regarding the misalignment present on the Five Iron, Umberger explicitly stated that he "would not characterize [the misalignment] as a contributing factor" to the fracture. (Id. at 85.) And as to the deformity in the shaft, Umberger stated that the nature of the deformity indicated "the flattening is consistent with the fracture event itself" and he saw no indication it was created prior to the fracture. (Id. at 51-52.) Moreover, all metallurgical experts in this case – including Umberger and Plaintiff's own expert – affirmatively concluded that the Five Iron met True Sports' specifications, there were no issues with the Five Iron's material properties, and there was no evidence of metallurgical defects. (Id.; Doc. 102-6, at 43; Doc. 94-2, at 27.) As such, Plaintiff points to no evidence in the record sufficient to create a question of fact as to whether there was a manufacturing defect.

b. *Design Defect*

Callaway and True Sports also argue Plaintiff has presented no evidence of a design defect, relying largely on the same arguments discussed in support of finding a lack of evidence as to a manufacturing defect. (Doc. 82, at 7-10; Doc. 88, at 7-8.) Callaway also argues summary judgment is appropriate due to the lack of expert testimony on the issue. (Doc. 88, at 8.) Plaintiff does not distinguish between a design and manufacturing defect in his briefings; thus, the Court applies the same evidence to the issue of a design defect as he relied on for a manufacturing defect. (See Doc. 102, at 2-3.)

The Court agrees with Callaway that proving a design defect here, which requires determining the proper load bearing strength of a metal component, requires the use of expert testimony. See Meade v. Ford Motor Co., No. 1:09-cv-1833, 2011 WL 4402539, at *2 (N.D. Ga. Sept. 20, 2011) ("Because the alleged design defect . . . is not one that can be understood by the reasonable juror, expert testimony is required." (citation and internal quotation marks omitted)); see also Moore v. Wright Med. Tech., Inc., No. 1:14-CV-62, 2016 WL 1298975, *3 (S.D. Ga. Mar. 31, 2016) (finding expert testimony necessary to support design defect in a case involving the fracture of a metal component used in artificial hips). Plaintiff's expert explicitly stated he rendered no opinion as to the design of the Five Iron or its shaft, and Plaintiff points to no other expert testimony to support finding a design defect.

(Doc. 102-6, at 85-86; see Docs. 102, 109.)    Moreover, both
Callaway and True Sports' experts concluded there was no evidence
of a design defect.    (Doc. 95-3, at 19; Doc. 95-7, at 26.)
Therefore, the Court **GRANTS** Callaway and True Sports' motions with
respect to the design defect theory.[4]

In sum, Plaintiff has provided no evidence of a defect.    As
such, Plaintiff's negligence and strict liability claims brought
under design and manufacturing defect theories fail as a matter of
law.

### 2. Proximate Causation

Assuming *arguendo* the deformity in the shaft was sufficient
to create a question of fact as to the existence of a defect,
Callaway and True Sports argue Plaintiff's product liability
claims nonetheless fail because he does not establish proximate
causation under the Sheffield Rule.    (Doc. 82, at 10; Doc. 88, at
10-14 (citing Sheffield v. Conair Corp., 821 S.E.2d 93, 97 (Ga.
Ct. App. 2018)).)    Plaintiff relies primarily on the doctrine of

---

[4] Even if Plaintiff pointed to evidence sufficient to support finding the
existence of a design defect, Plaintiff's design defect claim would still fail
as a matter of law.    "In a design defect case, Georgia law requires a risk-
utility analysis," whether such claim is brought under the theory of strict
liability or negligence. Jester, 2022 WL 1044060, at *6.    This analysis involves
consideration of several non-exhaustive factors, but "[o]ne factor consistently
recognized as integral to the assessment of the utility of a design is the
availability of alternative designs." Id.    Indeed, Georgia courts have held
"liability for a design defect [is imposed] only where the manufacturer has
failed to adopt a reasonable alternative design that would have reduced
*foreseeable* risks of harm posed by the product." Woods v. A.R.E. Accessories,
LLC, 815 S.E.2d 205, 210 (Ga. Ct. App. 2018) (citations omitted).    Plaintiff
provides no evidence of a feasible, safer alternative design, nor does he make
any argument as to why his claim would prevail under any of the factors
considered in the risk utility test.    (See Docs. 102, 109.)    Thus, Plaintiff's
design defect claims would still fail as a matter of law.

*res ipsa loquitor*, addressed below, to establish proximate causation. (Doc. 102, at 3-7.) Nonetheless, construing Plaintiff's arguments liberally, he also points to Umberger's testing of an exemplar club and testimony regarding the shaft's deformity and misalignment to argue the fracture proximately caused the defect. (Id. at 10.)

Under Georgia law, proximate cause is an essential element of both a manufacturing defect and design defect product liability claim, whether such claim sounds in negligence or strict liability. See Lakey v. Mentor Corp., No. 1:05-CV-929, 2007 WL 4811929, at *3 (N.D. Ga. Mar. 30, 2007); O.C.G.A. § 51-1-11(b)(1). As discussed above, Umberger's testing of an exemplar club and his statements regarding the deformity in the Five Iron's shaft and misalignment constitute, at most, an inference that if the deformity pre-existed the fracture, it could have contributed to the fracture. (See Doc. 102-7, at 51-52, 85.) To determine proximate causation by way of inference, such "[i]nferences must be based on probabilities rather than mere possibilities." Sheffield, 821 S.E.2d at 97 (citation and internal quotation marks omitted). "Indeed, when a plaintiff seeks to carry its burden of proof by inference, that inference must not only tend in some proximate degree to establish the conclusion, but render less probable all inconsistent conclusions." Id. (citations omitted); see also O'Shea v. Zimmer Biomet Holdings, Inc., 342 F. Supp. 3d 1354, 1361 (N.D. Ga. 2018) ("[A] plaintiff relying on circumstantial evidence must 'provide

evidence that would permit a jury to select his or her explanation, that of a manufacturing defect, as the most likely cause.'" (citing Williams v. Mast Biosurgery USA, Inc., 644 F.3d 1312, 1321 (11th Cir. 2011))). Mere speculation is not enough to establish proximate causation, and "where plaintiffs rely on allegations and assumptions in the face of evidence to the contrary, summary judgment is proper." Bunch v. Maytag Corp., 439 S.E.2d 676, 678 (Ga. Ct. App. 1993) (citations omitted).

In Sheffield, the plaintiffs argued a heating pad was defectively designed and, as a result, caused a house fire. 821 S.E.2d at 95. To prove proximate causation, the plaintiffs relied on two inferences: first, that the heating pad caused the fire and second, that a defect in the heating pad caused the fire. Id. The court found the plaintiffs sufficiently proved causation under the first inference because a fire chief affirmatively concluded the fire started in the area of the heating pad, making alternative possibilities less likely. Id. at 97. As to the second inference, the court found the plaintiffs did not carry their burden, pointing to the fire chief's statement that he could not say whether it was more likely than not a failure of the heating pad caused the ignition. Id.

Here, all experts concluded there was no evidence of a material manufacturing or design defect in the Five Iron. (See Doc. 95-3, at 19; Doc. 95-7, at 26; Doc. 106-2, at 138.) As such, the evidence Plaintiff relies on amounts to only speculative

inferences to support finding a defect existed at all or finding such defect caused the fracture.  As discussed above, Umberger's testimony explicitly states the Five Iron's misalignment did *not* contribute to the facture.  (Doc. 102-7, at 85.)  And as to the shaft's deformity, no expert testimony supports finding it was the most likely cause of the fracture.  To the contrary, the expert testimony affirms that the deformity more likely than not occurred *after* manufacturing and, most likely, was a result of the fracture event itself.  (See Doc. 95-9 at 3 (finding the deformity was more likely than not introduced after leaving Callaway's control); Doc. 106-2, at 119 (finding the deformity likely occurred during the fracture event itself).)  Umberger's testing of an exemplar club also does not render alternative conclusions of the fracture's causation less probable.  In fact, Umberger's conclusion was that "misuse or abuse of the product was the root cause of the fracture."  (Doc. 106-2, at 137.)  In conclusion, none of Plaintiff's evidence supports finding a manufacturing or design defect was the most likely cause of the Five Iron's fracture, so, Plaintiff has not provided sufficient evidence to survive summary judgment on proximate causation.

### 3. Res Ipsa Loquitor

Plaintiff dedicates most of his briefings to arguing that summary judgment is improper because the doctrine of *res ipsa loquitor* ("res ipsa") applies to his product liability claims. (Doc. 102, at 3-10; Doc. 109, at 3-5.)  Callaway and True Sports

argue res ipsa does not apply because the doctrine is inapplicable to strict liability claims and, as to Plaintiff's negligence claims, Plaintiff fails to establish any of the three essential elements. (Doc. 82, at 9-10; Doc. 88, at 15-17; Doc. 104, at 2-5.)

The doctrine of res ipsa "is an evidentiary based rule which provides for an inference of negligence to arise from the occurrence of an injury-causing incident." Matthews v. Yoplait USA, Inc., 835 S.E.2d 393, 396 (Ga. Ct. App. 2019) (citation and internal quotation marks omitted). It applies only in limited circumstances such that an inference of negligence is warranted despite a lack of evidence. Id. In such situations, "[t]he doctrine authorizes, but does not require, the jury to infer facts from the circumstances in which the injury occurred, thereby filling the evidentiary gap." Id. (citations omitted). For res ipsa to apply, the plaintiff must show three things: "(1) an injury which ordinarily does not occur in the absence of someone's negligence; (2) the injury must be caused by an agency or instrumentality within the defendant's exclusive control; and (3) the injury was not caused by any voluntary action or contribution on the part of the plaintiff." Id. (citation omitted). "Res ipsa loquitur should be applied with caution and only in extreme cases, and is not applicable when there is an intermediary cause which could have produced the injury." Sheats v. Kroger Co., 784 S.E.2d 442, 447 (Ga. Ct. App. 2016) (citation omitted).

The Court decides the applicability of this doctrine on the second element: whether the Five Iron was in Callaway or True Sports' exclusive control. True Sports argues the Five Iron was not in its exclusive control because at the time of the fracture, it had been transferred to another business for fabrication, packaged and sold by a retailer, given to Plaintiff, and previously used by Plaintiff. (Doc. 82, at 9.) Callaway similarly argues this claim fails because it is undisputed the Five Iron was in Plaintiff's exclusive control at the time of the fracture and Plaintiff had previously used the club. (Doc. 88, at 16; Doc. 104, at 3.) Plaintiff contends the exclusive control element is satisfied because only Plaintiff had access to the Five Iron before it fractured, there is no evidence Plaintiff misused it, and Plaintiff's minimal prior use does not defeat the applicability of res ipsa. (Doc. 102, at 10-11; Doc. 109, at 3-5.)

The Court finds the Five Iron was not in the exclusive control of Callaway or True Sports and, as such, res ipsa is inapplicable to Plaintiff's claims. As an initial matter, the Court notes that "Georgia law rejects the application of the *res ipsa loquitur* theory to a manufacturing defect" because, by the nature of such claims, the exclusive control element is usually lacking. Haynes v. Cyberonics, Inc., No. 1:09-CV-2700, 2011 WL 3903238, at *8 (N.D. Ga. Sept. 6, 2011) (citation omitted); see, e.g., Miller, 653 S.E.2d at 84; ACE Fire Underwriters Ins. v. ALC Controls, Inc., No. 1:07-CV-606, 2008 WL 2229121, at *3 (N.D. Ga. May 28, 2008).

In any event, the Court finds Plaintiff's arguments on the issue unavailing. Plaintiff argues this case is unlike those where the Court has found res ipsa inapplicable because the Five Iron was only in Plaintiff's possession for a few weeks, rather than months. (Doc. 109, at 3-4.) However, the length of time which the product has been out of Defendants' control is immaterial; rather, in the rare case where the theory is applicable despite the product being in the plaintiff's control, courts look to the condition of the product. See Macon Coca-Cola Bottling Co. v. Chancey, 114 S.E.2d 517, 519 (Ga. 1960) (holding that for res ipsa to apply, "there must be evidence to authorize the jury to find that the bottle was in the same condition when the plaintiff drank from it as when it left the manufacturer's control"). For example, Georgia courts have found res ipsa applicable to product liability claims when it is undisputed the product was in the plaintiff's control, but the plaintiff makes an affirmative showing that the product was properly handled in the usual and customary manner after leaving the manufacturers' hands such that the cause of any defect most likely occurred while in the manufacturer's control. See, e.g., Atlanta Coca-Cola Bottling Co. v. Danneman, 102 S.E. 542, 543 (Ga. Ct. App. 1920); Chancey, 114 S.E.2d at 519.

Even assuming an absence of abuse or misuse, Plaintiff provides no evidence that the condition of the club was not otherwise altered while in his possession - for example, during its transport from Atlanta to South Georgia, or from his home to

the driving range, or, perhaps most importantly, during his prior use of it. (See Doc. 102-2, at 3-5.) Indeed, the expert testimony makes clear the Five Iron's condition had materially changed since leaving True Sports and Callaway's possession, whether through normal usage or misuse and abuse. (See Doc. 102-6, at 73-74; Doc. 95-7, at 15-16). And it does not take an expert to see that, despite the short time frame in which Plaintiff possessed the Five Iron, its condition materially changed from looking "brand new," to being covered in scuffs, dirt, and an unknown red material. (See Doc. 102-5, at 83; Doc. 95-7, at 15-16.) Despite Plaintiff's characterization of the Five Iron as being in "substantially the same shape" as when it was purchased, he does not dispute the validity of the various pictures portraying signs of wear on its face and sole, nor that this wear was the product of his own use. (Doc. 102-2, at 6.) Moreover, the facts as admitted by Plaintiff contradict his assertion that he was the only person to have access to the Five Iron — it passed, at minimum, from True Sports to Vision, then to Dick's, then to Plaintiff's uncle, and finally to Plaintiff. (Doc. 102-2, at 1-5.) And Plaintiff points to no evidence that every intermediary handled the item properly. (See

id.).[5]

Relying on Kmart Corp. v. Larsen, 522 S.E.2d 763 (Ga. Ct. App. 1999), Plaintiff also argues res ipsa is applicable because he need only show the *likely* cause of the defect originated while the product was in the defendant's control. (Doc. 109, at 3.)  In Larsen, the plaintiff was struck by an item falling from a store shelf, and the plaintiff was uncertain whether she had bumped into the shelving.  522 S.E.2d at 764.  The appellate court found the res ipsa jury charge proper because no evidence was produced to affirmatively show the plaintiff contributed to the incident, and the shelving was in the exclusive control of an employee who was rearranging it at the time.  Id. at 765.  Here, unlike in Larsen, it is undisputed the Five Iron was solely in *Plaintiff's* exclusive control at the time of the fracture, not either of Defendants'. (Doc. 102-2, at 5-6.)  There is no uncertainty.

---

[5] The Court notes that the only evidence to support Plaintiff's statements as to his prior usage of the Five Iron is his own deposition.  On a motion for summary judgment, "a plaintiff's testimony cannot be discounted . . . unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature." Copeland v. Georgia Dep't of Corr., 97 F.4th 766, 777 (11th Cir. 2024) (citation omitted). Although the Court reaches its holdings without discounting Plaintiff's deposition, the Court finds Plaintiff's statements regarding his "minimal usage" of the Five Iron to be both incredible as a matter of law and blatantly contradicted by the record.  Not only did Plaintiff's story change as to how many times the Five Iron was swung after the experts concluded it had been swung multiple times (compare Doc. 30, at 4, with Doc. 102-5, at 11), but his current story that the clubs were each swung around three times is inconsistent with their condition as evidenced by photographs and expert examinations of them. (Doc. 95-7, at 15-16; Doc. 102-6, at 73-74; Doc. 94-3, at 38-39; Doc. 102-7, at 53-55.)

Accordingly, the Court finds the doctrine of res ipsa inapplicable to Plaintiff's claims because the club was not within Callaway or True Sports' exclusive control, nor was it in the same condition when the fracture occurred as it was when it left their control. As such, the Court declines to address the remaining two elements. In light of the foregoing, the Court finds Plaintiff produced insufficient evidence in support of his strict liability and negligence claims for design and manufacturing defect.

4. <u>Failure to Warn</u>

Callaway and True Sports argue Plaintiff's failure to warn claim similarly fails under <u>Sheffield</u>. (Doc. 82, at 10; Doc. 88, at 14-15.) Callaway also argues Plaintiff's claims premised on failure to warn fail for lack of evidence. (<u>Id.</u> at 15.) Plaintiff argues his failure to warn claims should survive summary judgment because his injury was foreseeable, again relying on Umberger's purported statement that "the fracture was caused by a dent in the shaft coupled with misalignment" to support this assertion. (Doc. 102, at 12-13.)

Under Georgia law, to prove a product liability claim based on a failure to warn theory, a "plaintiff must show the defendant had a duty to warn, the defendant breached that duty and the breach was the proximate cause of the plaintiff's injury." <u>Wheat v. Sofamor, S.N.C.</u>, 46 F. Supp. 2d 1351, 1362-63 (N.D. Ga. 1999) (citation omitted). A duty to warn arises "when the manufacturer knows or reasonably should know of a danger arising from product

43

use." Id. at 1363 (citation omitted). "Under Georgia law, a manufacturer breaches its duty to warn if it fails to adequately communicate the warning to the ultimate user or [. . .] fails to provide an adequate warning of the product's potential risks." Watkins v. Ford Motor Co., 190 F.3d 1213, 1219 (11th Cir. 1999) (citation and internal quotation marks omitted).

Because Plaintiff has failed to set forth sufficient evidence as to both the existence of a defect and proximate causation for his design defect and manufacturing defect claims, Plaintiff's failure to warn claims also fail as a matter of law. See Sheffield, 821 S.E.2d at 97-98 (affirming summary judgment on failure to warn claims because of a lack of sufficient evidence as to the existence of a defective condition); see also Orkin Exterminating Co. v. Dawn Food Prods., 366 S.E.2d 792, 795 (Ga. Ct. App. 1988) (finding plaintiff had no failure to warn claim on similar grounds).

Because the Court finds all three theories under which Plaintiff asserts its product liability claims fail as a matter of law, Callaway and True Sport's motions for summary judgment on Counts I, II, III, and IV are **GRANTED**. Accordingly, Plaintiff's derivative claims for attorney's fees and punitive damages, Count VII, are **DENIED** and, because the Court does not reach the issue of damages, Callaway's motion to strike sections of Plaintiff's sur reply related to such (Doc. 110) is **DENIED AS MOOT**.

### V. CONCLUSION

For the foregoing reasons, Vision's motion to dismiss (Doc. 48) is **GRANTED** and motion for summary judgment (Doc. 83) is **DENIED AS MOOT**; True Sports' motion to exclude expert testimony (Doc. 80) is **DENIED**; Callaway's motion to exclude expert testimony (Doc. 86) is **GRANTED**; Plaintiff's motion to exclude expert testimony (Doc. 94) is **DENIED**; True Sports and Callaway's motions for summary judgment (Docs. 77, 87) are **GRANTED**; and Callaway's motion to strike (Doc. 110) is **DENIED AS MOOT**. The Clerk is **DIRECTED** to **TERMINATE** all pending motions and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this _20th_ day of August, 2025.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA